New Jersey Department of Labor,
Workmen's Compensation Bureau.

NELLIE DANIELS, PETITIONER, v. ESSEX MOUNTAIN
SANATORIUM, RESPONDENT.

Decided August 8, 1941.

For the petitioner, *Perry E. Belfatto.*

For the respondent, *Edwin J. O'Brien.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

The petitioner was the first witness produced on her own behalf, and she testified that on August 15th, 1938, she felt a smarting sensation on her temple right near the eye, went to the mirror and looked at it and found a red spot at the point where she felt the smarting sensation. She testified that this was the first information that she had that there was anything wrong with her skin. The witness stated she first went to Dr. Ormsby, one of the resident physicians at the Sanatorium, but that she did not remember, even approximately, when that was although she does remember distinctly the date of the appearance of the lesion. She further testified that she saw Dr. Paul Keller making his rounds in the hospital and spoke to him relative to the skin condition. He referred her to a Dr. N. B. Heller for treatment. After being treated by Dr. Heller, the petitioner stated that she saw Dr. Keller who is chief medical examiner for the carrier on his rounds at the hospital and she told him that she was not satisfied with Dr. Heller's treatment, so he referred her to

Dr. Frank J. McCauley. She states that she was treated by Dr. McCauley for three or four months and that a biopsy was done; that she was not treated by Dr. Ormsby until after the biopsy and treatment by Dr. McCauley. Dr. Ormsby, to whom she went of her own volition, gave her gold and sodium bismuth treatment. She continued on with the work and then subsequently on one occasion she temporarily lost the vision of her left eye. Becoming alarmed she reported to Dr. Harmon and he recommended Dr. Pfahler of Philadelphia. The petitioner went to see Dr. Pfahler of Philadelphia and was treated by him after he called in a Dr. Gilmore.

Tests were made and a biopsy performed and the doctors diagnosed her facial condition as a tuberculosis of the skin. The petitioner stated that she paid the bills of Dr. Pfahler and Dr. Gilmore.

The petitioner testified that prior to the appearance of the lesion of August 15th, 1938, which is in question here, that so far as her health was concerned "I have always been very well as far as I can remember back," and in answer to the question "what was the condition of your skin prior to the accident?" she answered "my skin was perfect."

Cross-examination of this witness revealed these facts, which were later properly proved by the production of the witnesses who made the records: That on October 13th, 1932, she had a series of barium meal X-rays which disclosed a chronic retentive appendix; that beginning with June 22d, 1933, she was treated for five consecutive treatments for a "dermatitis vesicularis." On April 4th, 1931, an X-ray was taken which showed a chronic fibrosis at the apices of the lung; that she received twenty-two treatments beginning February 24th, 1936, with the Alpine lamp for the purpose of general toning up of her system and that beginning March 26th, 1936, she received three treatments for a skin eruption on the left side of the forehead; that on January 20th, 1937, she received general Alpine treatments for general tonic treatment; that on April 5th, 1937, she received ultra short wave therapy for a back condition, which was again repeated up until April 8th, 1937; that thereafter, on April 11th, 1940, she was X-rayed for a pelvic disorder and prior thereto

for a gastro intestinal complaint and that she was X-rayed again in December, 1939, for an ankle condition. Despite the fact that these occurrences were proved by the production of the records of the hospital plus the testimony of the persons who made the records the petitioner on cross-examination attempted to dispose of them in the following manner: She remembered the barium meal X-rays which disclosed the chronic retentive appendix but denied the treatment for a dermatitis vesicularis in June, 1933, and denied any X-rays taken on April 4th, 1931, which showed a fibrosis at the apices of the lung, did not recall the twenty-two treatments from February 23d, 1936, with the Alpine lamp and did not remember the March 26th, 1936, occasion when she received three treatments for a skin eruption but later stated that she might have had a food rash or strawberry rash. She stated she did not remember the general Alpine lamp treatment on January 20th, 1937, and she stated emphatically that she did not receive the ultra short wave therapy from April 5th to April 8th, 1937, to her back, denied any X-rays or examinations for gastro intestinal upset and denied being X-rayed on April 11th, 1940, for a pelvic disorder, admitted the X-ray for her ankle condition in December, 1939.

The petitioner testified that the second facial lesion in 1938 appeared approximately two or three weeks after the first lesion. The witness again admitted that she had paid carfare to and from Philadelphia, for the consultation of Dr. Gilmore as well as and also the bill of Dr. Pfahler.

Dr. Samuel B. Greenwood was produced as an X-ray specialist by the petitioner and stated that the effect of X-rays is cumulative, and this doctor stated that you can recognize an X-ray burn because it is a burn. He stated "it would require such an enormous amount of that (indirect radiation) I doubt it very much," (that it would burn the operator). When this witness was recalled at a later session he stated that he does not know how much radiation the petitioner would get in the position in which he assumed she was when the X-rays were being taken; in other words, he does not know how much radiation she received as the result of the indirect rays from the X-ray machine.

Dr. Anthony Daniel Crecca, a resident physician at the Sanatorium, was called on behalf of the petitioner, and stated that at various times the petitioner would question him regarding one phase or another as to her complaints. Dr. Crecca stated that "as far as I was concerned, this girl had a granulomatous lesion of the skin, which very likely was tuberculosis." He later stated that in his opinion from the original appearance of it he thought it was an X-ray burn and that while on some occasions he saw the petitioner in the room where Dr. Harmon was operating the X-ray machine and the petitioner was placing the subjects in position to be X-rayed, that "she was certainly right in line or at least in line with some of the rays that were going by her." This doctor also stated "I would say here that within the period of a few hours the repeated exposure of the patient to the X-ray would cause a burn or injury, whereas over a period of weeks the similar exposure may not." This doctor stated he was in the room four or five times. He stated further that he did not know what type of tube was in use at or about the time of July, 1938, and admitted in that regard "anything that I would say would be a guess." This witness claims to be able to remember that he saw the petitioner within a week after the appearance of the lesion, although the petitioner herself cannot tell how long after the appearance of her lesion it was that she first saw this doctor. The doctor stated he made no notation as to the date he saw her as it did not mean anything to him, neither does he remember what was said at the time by the petitioner as to how long it was after she first noticed the lesion. This doctor also stated in his testimony that he does not know whether it was "a week after August 15th or May 18th or whatever it was." There is a discrepancy between the testimony of the doctor and the petitioner as he states that the original site of the burn was at the temple and also at the side of the cheek, two lesions, when the petitioner herself stated that the second lesion appeared on her face about two or three weeks after the first lesion. This witness stated that he gave the petitioner no treatment, that he made no tests to find out what the exudation from the lesion was or what was causing it. He further stated

"I do not recall exactly when the glanulomatous appearance came on, but I know it was much later." "After several months it became glanulomatous." When he was asked how soon after an X-ray exposure you would get a red area or an erythema, this witness answered "within twenty-four or forty-eight hours." "I suppose it depends on the—well, it does depend on the size of the dose." Inasmuch as this was completely contradicted by Dr. Baker on behalf of the respondent and by Dr. Greenwood, who appeared for the petitioner, who both testified that as a result of indirect radiation one could not tell how long it would take and the dose would have to be enormous, this witness is apparently not an expert in that line. This witness also stated that the appearance of tuberculosis of the skin and an X-ray burn are entirely different and that you do not get the appearance of a tuberculosis of the skin with an X-ray burn.

This witness made a very significant statement when he said that the minimum and maximum time from the appearance of the first red lesion to the time it may become granulomatous in tuberculosis of the skin, varies from three weeks to approximately six months, because from his own statement that is apparently the time in the case *sub judice* from the appearance of the original red lesion to its becoming granulomatous. Furthermore his description of what occurs from the initial appearance of tuberculosis of the skin as compared with his description of what occurred here shows that apparently this petitioner did have a tuberculosis of the skin and the course of the lesion is exactly as described by this doctor. The witness further admitted that he did not know the petitioner had been X-rayed for an upper respiratory infection and that he did not know that this petitioner had received treatment from face lesions before, showing that he knows little or nothing about the petitioner's prior condition, so far as it is germane to this case.

The petitioner produced James S. Patrick, who testified that he was chief engineer of the Essex County Mountain Sanatorium in Verona, and he testified as to the installation of the X-ray apparatus, but it is perfectly obvious from this witness' own testimony as well as the testimony of Dr. Har-

mon, the superintendent of the institution, that this witness was merely an electrician and not an X-ray specialist and that his only province in this matter was to make the electrical connections in the sanatorium with the machine brought in by the X-ray people. His testimony was evidently an attempt to show that there was no lead in certain glass used for protective purposes under the old installation and at the time the petitioner claimed she was burned, but the witness stated that he could not tell whether there was lead in the glass by looking at it and furthermore stated that despite a test which he attempted to testify to in regard to a dental film, that in his opinion there was not "sufficient" lead in this glass used as a shield at the time of the alleged X-ray burn. It is perfectly obvious that he is not an expert on roentgenology and his own statements reflect that any information he may have is based upon hearsay and not upon any knowledge that he may have.

Dr. Thomas J. Ormsby was produced on behalf of the petitioner and stated that he had for five years been a resident physician at the Essex Mountain Sanatorium at Verona, and that he made three examinations of the petitioner, the first one on September 15th, 1938, the second examination on March 23d, 1940, and the last one on February 15th, 1941. It is very interesting to note what this doctor has to say about Miss Daniels' statement to him upon her first visit. He said "at that time the lesion was not particularly definite." "* * * She told me that she had noticed a lesion or a sore developing on the margin of the left eye.". And "* * * there was not sufficient there to make any definite diagnosis * * *." He stated that at that time he made a tentative diagnosis of an X-ray burn, basil cell epithelioma, possible eczeme and possible fungus infection." He stated that there appeared "in two months' time * * * she had an indulent ulcer of the left cheek at the external margin of the eye. The *disease* was progressive from the time I first saw it, and at the time she first came to me she told me it was about four weeks old."

The doctor said that he made a definite diagnosis of an X-ray burn on November 16th, 1938, and that when he saw

her in March, 1940, again that "she had received no adequate treatment, apparently, for this during the period which she had been away from my care." And "I have no positive knowledge of the change or what caused it, except it may have been the progression of the original lesion itself, but there may have been some superimposed infection. That I can't tell you from my own knowledge." This doctor stated that he rendered a bill of $73 for treatment but that he rendered it to Miss Daniels herself and not to the county or any insurance company. This witness testified that he was not a roentgenologist and not connected with any institution in the capacity of a roentgenologist. This witness also stated that he was not a pathologist. At the time this witness first saw it "it just had the characteristics of an inflamed ulcerated area." In answer to the question "it might have come from any number of things, isn't that so?" The witness answered "yes."

This witness said that a very significant thing was the white blood cell count, which was 6,800, and he stated that the normal white blood cell count of an adult woman was between 7,500 and 10,000. He testified that this 6,800 white blood cell count was "a very definite indication of the changes which occurred in her white blood picture." "That is one of the laboratory confirmations of my diagnosis." This doctor's testimony in this regard was completely nullified when a Dr. Otto Lowy, pathologist of long standing, produced by the petitioner, testified that 6,800 was a normal white blood cell count for an adult woman and that it was not inordinately low as this witness had stated.

This witness testified that he had examined X-rays to rule out tuberculosis and he also made blood examinations to rule out other conditions. This witness stated that he never considered this lesion as tuberculosis, and still does not. However, this witness' opinion is that "the exposure there over the period of years with the increased exposure of the year preceding the appearance of this lesion is what caused the lesion." "That was the definite cause of this disease." He stated that he called up a skin man on November 16th, 1938, when the lesion did not respondent to his treatment, "* * *

because I thought she should have further work to determine the exact cause of the lesion histologically." Although this witness stated that he wanted a work-up made to make certain of the diagnosis, he did not have one done. He expressed the desire to know what one would show. This witness further stated that he did not think it was a lupus vulgaris but that if it was a lupus it would fall into two possible considerations: Lupus vulgaris or anatomical tubercular or wart like tuberculosis. This witness stated that he does not think she had a lupus or tuberculosis of the skin and he still does not think she has it, despite the positive proof by the respondent's doctors plus the admission by the petitioner's doctors that she has it. This witness further stated that if it could be shown that this woman's facial lesions were lupus, "I don't imagine you could distinguish its progress" from other lupuses he has seen. The doctor stated that he believed the appearance of the lesion is non-definitive when it first appears. "There is such a multitude of appearances of lupus you would not be able to ascribe it to any one lesion." This witness, in common with the other witnesses produced by the petitioner, stated that he did not know that the petitioner had had skin trouble over a period of years at the institution and that although he recommended a biopsy done, and considered it important, that she did not go to the doctor whom he recommended and it was not done so far as he knows.

Dr. Otto Lowy was next produced on behalf of the petitioner and his qualifications were admitted in the field of pathology and diagnosis with special reference to industrial diseases and injuries. This doctor stated that the petitioner was at his office in October, 1940, and Dr. Lewis examined her and he, Dr. Lowy, only examined the petitioner this morning. He stated that their physical examination was essentially negative.

At this point petitioner's counsel stated that petitioner, when undergoing cross-examination, would change her direct examination and admit that she had some pimples some years ago in the mid frontal region of the forehead.

This witness stated that "in August, 1938, the first evidence of a burn appeared, that red blotch. That red blotch, of

course, did not occur from a burn; that occurred at that particular time, but in my opinion was the accumulation of constant exposure over a period of time." The correct prior history was not given to this doctor, as he had no history of a prior condition of skin eruptions or infections of the face. This doctor admitted that cauterization or electro-dessication is not treatment for an X-ray burn. He further stated that injections of gold which the petitioner received and the histological tests of Dr. Pfahler showed she has a lupus (tuberculosis of the skin). This witness stated that his own best opinion is that the girl had a tuberculosis of the skin. He stated that a smarting sensation on the appearance of the lesion as described by the petitioner and its initial appearance is such as you would get in an endogenous lesion (one which comes through the blood stream or from within). He further stated that a 6,800 white blood cell count is not abnormally low in an adult female and that the normal range is from 5,000 to 8,000.

Dr. Leon Lewis was the next witness produced on behalf of the petitioner and his specialty, which was admitted, is diagnosis and clinical pathology. This witness stated that the *August 15th, 1938, occurrence was unimportant* and that if the history were to be believed that it was caused by repeated exposures to X-ray, though he cannot say that the occurrence of August 15th, 1938, had any effect. The doctor stated that he was not a roentgenologist and not familiar with roentgenological doses, &c. He stated that it was impossible for him to make a diagnosis now or when he saw her. The diagnosis was based entirely upon the history given to him and that if he knew of previous skin eruptions it would make a difference in his diagnosis. Furthermore, he stated that cauterization by electro-dessication is not treatment for an X-ray burn. The treatment she received was for tuberculosis so far as he could ascertain and that she could have had the scars from the tuberculosis of the skin without any X-ray burn whatsoever. Furthermore he admitted that the way this skin lesion manifested itself is the way that tuberculosis of the skin or any other lesion might manifest itself "a skin

burn or anything." He further admitted that the way this skin lesion manifested itself is not usual for manifestation of an X-ray burn, that this was particularly the natural manifestation of a skin tuberculosis. The doctor stated he never treated an X-ray burn and has not seen any in private practice. He saw some when he was back in medical school where they were already diagnosed and he cannot say in this instance that there was any specific X-ray burn.

Dr. Martin Castellano was produced as a witness on behalf of the petitioner and stated that he has been practicing since 1934 and he is a resident physician of the Essex Mountain Sanatorium. This witness stated that he saw the petitioner approximately five times a week for a period of about a year. This witness does not know the date he saw the petitioner for the first time; all he knows that he examined her face. The witness' opinion is that there was an X-ray burn but no other involvement. This witness states he referred the petitioner to Dr. McCauley. The witness stated he is not a roentgenologist, does not know how much exposure is necessary to have an X-ray burn, does not know what is necessary for an X-ray burn and knows nothing about X-ray burns or intensities necessary for an X-ray burn. He did, however, testify it would be necessary to be in a direct line with the tube to get an X-ray burn though he never treated a case of X-ray burn and never has seen an X-ray burn since leaving medical school and those were shown to him. He stated that an X-ray man could better determine those questions. He stated that the petitioner, when she placed the children for the X-ray exposure, did not block the ray, but stood a few feet to the side and he admitted that he did not know the diameter or the size of the aperture through which the X-ray was focused and he did not know much about what happened to the ray after it left the machine.

Dr. Ambrose Dowd was next produced on behalf of the petitioner and he testified that he found the petitioner was suffering with a permanent disability of approximately 30% of total, due to the disfigurement which contributed to the disability. He admitted that a gynecological operation is a competent producing cause of an anxiety neurosis or a

neurosis from which this petitioner suffered, so that whatever disability there was it could very easily be made up of a combination of a gynegological operation plus anxiety over the scars. He did not attempt to establish causal relationship between the lesion which first appeared on August 15th, 1938, and the present scarred condition of the petitioner's face.

Dr. Raphael Russomanno was produced as a witness on behalf of the petitioner and he believes her disability, which he estimated at 35% to 40% of total permanent disability, was due to the scarring condition but it is based entirely upon the scarred condition and neurological symptoms regardless of their cause. This doctor did not attempt to establish causal relationship between the appearance of the lesion on August 15th, 1938, and her employment. He testified, however, that the dysmetria for which the petitioner was treated at the hospital may cause part of the disability from which the petitioner presently suffers. In other words, that the dysmetria is a competent producing cause of a neurosis, from which the petitioner suffers.

Dr. Byron M. Harman was the next witness produced and he was produced on behalf of the respondent, and he testified that he was the superintendent at the Essex County Mountain Sanatorium at Verona, and that he had known the petitioner for years, that she had complained to him about a skin condition several years before August, 1938, and that it resembled a ring worm infection. He stated that though he operated the X-ray machine many times he had never seen the petitioner stand in the path of the rays and that there was no reason why she should have ever stood in the path of the rays. He stated that the petitioner came to him many times about her face and finally he suggested a Dr. Pfahler in Philadelphia "who could give her a definite answer as to what she was suffering from." He stated that a number of years before she had asked him about a pimple or a minor infection which grew and did not respond to whatever was done for it; it was causing her great irritability and growing in size." The witness also stated that Mr. Patrick, the engineer produced by the petitioner, was merely the chief engineer and he made the electrical connections with the installed X-ray apparatus.

He had nothing to do with the X-ray apparatus itself. This witness stated that the X-ray tube was placed inside of a bowl and the bowl was supposedly leaded and had been so represented to him by the General Electric Company who sold the county the apparatus. There was sufficient thickness of filters, according to the representative of the company from whom they purchased the equipment. The witness stated that he would not know if Miss Daniels received treatment for tuberculosis at the institution without referring to the record, inasmuch as there are around 650 patients and staff.

Dr. Jack Blumberg was called on behalf of the petitioner and testified that the petitioner's neurological status was secondary to the scarring of the face and worrying over it and that she had approximately 30% of total disability. He also admitted that an ovarian operation is a competent producing cause of neurosis. The petitioner admitted that she had an ovarian operation some years prior to the onset of the lesion.

Dr. Frank J. McCauley was one of the witnesses mentioned in the petitioner's petition as a treating physician and was called as a witness on behalf of the respondent and testified that for twenty-five years he has been a practicing physician, specializing in the field of dermatology (skin diseases). He stated that he saw the petitioner first on April 6th, 1939, and he had seen and treated many X-ray burns and in his opinion this was decidedly not an X-ray burn. His differential diagnosis between an X-ray burn and this condition, was that he did not even consider this to be an X-ray burn at any time although the petitioner suggested to him that it might be. He stated that electro-dessication is not indicated where there is an X-ray burn but that it is indicated where there is a tuberculosis of the skin. This witness does not believe there was a tuberculosis superimposed upon anything else, but that it was originally tuberculosis, but that they did not find concrete evidence of the tubercular bacilli in the part which they biopsied. This witness testified that he believed that tuberculosis of the skin usually comes from within, in other words, that it is endogenous. And he wound up his testimony by stating "I feel now quite definitely that

it was always a tuberculous lesion which had not developed sufficiently for us to diagnose at the time I saw it." He also stated that the hair in the temple region grew again in that portion of the lesion that was on the side of the face underlying the hair. He stated that hair does not grow again if there is an X-ray burn, because the X-ray burn destroys the hair follicle and root and the hair does not grow in that place.

Dr. Charles Baker, a roentgenologist of over twenty-five years standing, connected with many institutions and societies in that capacity was the next witness produced on behalf of the respondent. He stated that he had seen a great many X-ray burns and that electro-dessication is not indicated for the treatment of any X-ray burns. He also stated that hair does not grow again in the region where there has been an X-ray burn. When given a hypothetical question based upon the facts produced by the petitioner's testimony he stated emphatically that this was not a question of an X-ray burn but the question of an endogenous tuberculosis from the very onset. He stated that an operator who placed children in position would not be in a direct ray; that the scattered rays which she might get could not burn the operator. He stated that electro-dessication or cauterization is not indicated in cases of X-ray burns and in fact it would be *contra*-indicated. Dr. Baker stated that petitioner's description of what occurred when she first noticed the face lesion is not a description of an X-ray burn. The doctor repeated that you cannot get an X-ray burn from an exposure to indirect rays; and that such exposure will not make the skin red. The only danger of too much indirect radiation is the production of a leukemia, a condition of diminution in the white blood cells. This doctor testified that X-ray tubes give forth X-ray, which are physical elements and the danger is the same from all of them. The danger is, except in direct radiation, blood changes. The doctor stated that even if it were a direct radiation which might cause a burn that the redness would not come until about the sixth day after an X-ray burn in blondes; in brunettes about nine or ten days after. It would not develop within twenty-four to forty-eight hours after the exposure. The doctor stated that indirect radiation would

not cause a burn of this type where the skin is alleged to have been red and furthermore the witness would not call the petitioner a blonde.

Dr. Arthur Sonnenberg was next produced as a witness on behalf of the respondent and he was called and proved the fact that petitioner had been X-rayed at the institution for an upper respiratory infection.

Dr. William F. Bennett was next produced on behalf of the respondent and testified that he was first assistant physician at the Essex County Mountain Sanatorium, Verona. He proved the records of the petitioner with reference to the twenty-two treatments rendered to the petitioner, which started February 24th, 1936, and wound up March 20th, 1936, for general tonic, also for the tree treatments rendered for the skin eruption of the left side of the forehead beginning March 26th, 1936, also for the general irradiation for general tonic effects, which started on January 21st, 1937, and also for the treatment to petitioner's back on April 5th, 7th, 8th and 9th, 1937, which petitioner denied. He also testified and proved the records with regard to the seven treatments with a Kromeyer lamp given petitioner from February 8th, 1939, to March 21st, 1939. He also testified that on October 18th, 1939, he saw the petitioner for dysmenorrhoea and abdominal complaints. He stated that on April 4th, 1931, an X-ray was taken of petitioner's chest which revealed fibrosis and that on August 25th, 1940, the X-ray showed a roughened left apex. He also testified that chronic fibrosis frequently follows tuberculosis.

Louise Springer, a nurse at the institution, was next produced on behalf of the respondent and proved the records and testified to the treatments rendered petitioner from June 22d, 1933, to June 26th, 1933, five treatments, for skin condition under the chin and that from March 26th, 1936, she received three treatments for an eruption of the skin on the left side of the forehead.

Dr. Baxter Clement was produced as a witness on behalf of the respondent and testified as the result of an examination of the petitioner that he found no permanent disability due or in any way related to the episode of August 15th, 1938.

Dr. Asher Yaguda was next produced on behalf of the respondent and his qualifications were established as a clinician, in medical diagnosis and clinical pathology. He testified that the petitioner did not have an X-ray burn, taking the facts elicited from her on her behalf in the direct case into consideration. That in his opinion she undoubtedly had a tuberculosis of the face brought through the blood and making its appearance manifest on August 15th, 1938, by this smarting sensation and the red blotchy appearance. The doctor stated that this smarting sensation and the appearance of it is typical of the moment of seeding or when the tubercular bacilli blocked the capillaries of the skin. He further stated that the course of events and the appearance of the lesion were conclusive of the fact that it is a hemotogenous tuberculosis. He further stated that the description given by Dr. Crecca, who appeared on behalf of the petitioner, of the lesion when he first saw it, a week or so after its appearance, is typical of a papillae necrotic tuberculi. The doctor stated that it was his opinion a typical endogenous tubercular lesion. He also stated that the X-rays taken of the petitioner's chest also would suggest previous tuberculosis and that the treatments given to her would indicate that during this period of time her health had not been up to par, despite her statement that she was in good health prior thereto. The doctor stated that tuberculosis of the skin is common and the most likely place for tuberculosis of the skin to manifest itself is on the face. He stated that X-ray treatment is not indicated for an X-ray burn and that in his opinion this was an endogenous condition.

During the course of the trial respondent's attorney asked the petitioner's attorney, did he intend to take the deposition of Dr. Pfahler and Gilmore in Philadelphia, petitioner's doctors, as he, petitioner's attorney, had suggested to respondent's attorney. Respondent's attorney stated that two applications had been made to take the depositions of the missing doctors in Philadelphia and tentative arrangements made with a stenographer attached to this court to take the testimony *de bene esse*. Petitioner's attorney stated that he was not going to take any depositions and thereupon respondent's attorney

called for the production of a letter sent by Dr. C. E. Pfahler of Philadelphia to petitioner's attorney dated December 19th, 1940. The letter was produced and reads as follows:

"December 19, 1940.

Perry E. Belfatto, Atty.
790 Broad St.
Newark, N. J.

Re: Miss Nellie Daniels

Dear Mr. Belfatto:—

I have your letter of December 18th. Before arranging for any deposition from me, I want you to know that I have never looked upon or diagnosed the case of Miss Daniels as an X-ray burn, and if I am called upon to testify, I will swear that it is not an X-ray burn and there is no evidence of an X-ray burn. She had tuberculosis of the skin proven both clinically and microscopically, and it is my opinion that X-ray exposure had nothing whatever to do with it.

It would seem that before you file any petition on the basis of an X-ray burn, you should have made some inquiry as to any such evidence.

Yours very truly,

P:M                                     C. E. Pfahler (signed)."

Petitioner thereupon called for the production of a letter from Dr. Asher Yaguda to the Bankers Indemnity, which was produced and set forth that Dr. Yaguda could find no causal relationship but that in view of the fact that there might be neurological developments he would suggest that the matter be disposed of as speedily as possible by way of settlement.

After listening to the testimony and carefully considering all the evidence adduced before me written as well as oral, and observing the witnesses, and their demeanor on the stand, as well as considering whether they were disinterested or biased, I have come to the following conclusion, and do hereby determine as a matter of fact,

(1) That the petitioner has failed to sustain the burden of proving by a preponderance of the evidence, that she suf-

fered an X-ray burn (as alleged in the petition) and that the scarred condition of her face came as the result of an X-ray burn,

(2) That the petitioner has failed to prove that a tuberculous lesion was engrafted or superimposed upon any primary X-ray burn, which conditions led to the scarirng as exhibited on petitioner's face,

(3) The petitioner having failed to prove that she sustained an X-ray burn as alleged on August 15th, 1938, or that such alleged X-ray burn was the underlying factor in the production of a tuberculosis lesion engrafted thereupon,

It is, therefore, on this 8th day of August, 1941, ordered that petition of petitioner be and the same is hereby dismissed.

JOHN C. WEGNER,
*Deputy Commissioner.*